[No. 48521–6.   En Banc.   March 10, 1983.]

*In the Matter of the Welfare of*
BERTHA COLYER.

*Philip E. Rosellini* and *Gregory L. Kosanke* (of *Smith & Rosellini*), for appellant.

*Karlene K. Weiland,* for respondent.

BRACHTENBACH, J.—The husband of a woman in a chronic, vegetative state sought a court order to discontinue life sustaining systems. Because of the immediate need for judicial review, a special en banc hearing was held, and we affirmed the trial court's order directing that the life support systems be withdrawn. With this opinion we set forth the reasons for that order and establish general guidelines for future cases.

I

We begin by recounting the facts. On March 8, 1982, Bertha Colyer, age 69, sustained a cardiopulmonary arrest; her heart stopped beating. Although she was resuscitated by paramedics, her body was without oxygen for approximately 10 minutes, resulting in massive brain damage.

After being taken to St. Luke's Hospital in Bellingham, she was kept alive by artificial life support mechanisms. She required a respirator in order to breathe, and she remained in a comatose state, unresponsive to pain or verbal stimuli. In short, she was unable to breathe on her own and remained in a persistent vegetative state.

The prognosis for any sort of meaningful existence was zero, according to the findings. Weeks elapsed without any signs of neurological improvement or lightening of her coma. Two physicians, a cardiologist and a neurologist, agreed that the likelihood of Bertha Colyer recovering any significant amount of brain function was extremely small. They also agreed that she would probably expire within a short period if removed from the respirator. Even their most optimistic prognosis was that she might be able to

breathe on her own, but would persist in a very infantile state, unable to speak or communicate and requiring maintenance of all bodily functions.

Bertha Colyer's husband was appointed guardian over Bertha's person and estate; he petitioned the Superior Court to authorize removal of the life support systems. The husband's affidavit in support of the petition stated in part:

> It is very painful for me and Bertha's family to see her in her current condition. We all love her very much and would like for her to be able to live her final days and pass through this life with dignity, rather than being maintained by artificial means.

A guardian ad litem was appointed to represent the interests of Bertha Colyer. After a hearing, which included testimony from the two physicians and Bertha Colyer's husband and sisters, the Superior Court judge ruled that the "life support systems presently in place and sustaining Bertha Colyer shall be withdrawn and terminated forthwith." He based his ruling on the patient's right of privacy, the testimony from her family that it would be Bertha's wish to have the life support systems removed, and the medical testimony that there was no hope for her recovery to a sapient state. The trial court stayed its order, however, to provide the opportunity for review by this court.

On April 1, 1982, after hearing oral argument, we affirmed the trial court's order. Bertha Colyer died peacefully soon after the life support systems were removed.

## II

Despite Bertha Colyer's dismal prognosis, she was not legally dead according to the criteria of the Uniform Determination of Death Act. *See In re Bowman,* 94 Wn.2d 407, 617 P.2d 731 (1980). This act, judicially adopted in Washington, states:

> An individual who has sustained either (1) irreversible cessation of circulatory and respiratory functions, or (2) irreversible cessation of all functions of the entire brain, including the brain stem, is dead.

*In re Bowman, supra* at 421 (quoting Uniform Determina-

tion of Death Act (August 7, 1980 recommendation)). While Bertha Colyer was unable to breathe without a respirator, her other circulatory functions, such as her heartbeat and blood pressure, remained stable. Moreover, while she remained in a coma, inert to any sensory stimuli, monitors indicated some minimal reflex movement in the lower portion of her brain stem and the cerebral cortex. Thus, her situation is not governed by *Bowman*; it is expressly excluded from its scope. *Bowman*, at 417.

Nor is this situation governed by the Natural Death Act passed by our Legislature in 1979. RCW 70.122. This act enables a competent adult to sign a directive, witnessed by two disinterested parties, which requires the removal or withholding of his or her life sustaining treatment where such treatment only serves to artificially prolong the moment of death, made imminent by an incurable injury, disease, or illness. RCW 70.122.030. When such a directive has been signed, the course is set: the directive is to be effectuated in good faith, RCW 70.122.060, and no civil or criminal liability attaches. RCW 70.122.050.

While this act is a salutary step towards establishing legislative guidance in this area, it does not speak to the situation where no directive has been signed. Nonetheless, we note that the findings of the Legislature and the thrust of the act are in harmony with our ruling today:

> The legislature finds that adult persons have the fundamental right to control the decisions relating to the rendering of their own medical care, including the decision to have life–sustaining procedures withheld or withdrawn in instances of a terminal condition.
>
> The legislature further finds that modern medical technology has made possible the artificial prolongation of human life beyond natural limits.
>
> The legislature further finds that, in the interest of protecting individual autonomy, such prolongation of life for persons with a terminal condition may cause loss of patient dignity, and unnecessary pain and suffering, while providing nothing medically necessary or beneficial to the patient.

RCW 70.122.010. Thus, our Legislature has acknowledged both an individual's right to control medical decisions and the right to privacy as grounds for withholding or withdrawing life sustaining treatment.

## III

As this is a case of first impression in Washington, we look to other jurisdictions for information and guidance. Five other states have addressed the issue of an incompetent's right to have life sustaining treatment withheld or withdrawn. *See In re Quinlan,* 70 N.J. 10, 355 A.2d 647, *cert. denied,* 429 U.S. 922, 50 L. Ed. 2d 289, 97 S. Ct. 319 (1976); *Superintendent of Belchertown State Sch. v. Saikewicz,* 373 Mass. 728, 370 N.E.2d 417 (1977) (hereinafter *Saikewicz); Leach v. Akron Gen. Med. Ctr.,* 68 Ohio Misc. 1, 426 N.E.2d 809 (1980); *Severns v. Wilmington Med. Ctr., Inc.,* 421 A.2d 1334 (Del. 1980); *In re Storar,* 52 N.Y.2d 363, 420 N.E.2d 64, 438 N.Y.S.2d 266 (1981). All of these courts have recognized the right of a patient to refuse life sustaining treatment in appropriate circumstances. This right has been premised on a constitutional right of privacy, *Quinlan,* or, alternatively, on a common law right to be free from invasions of one's bodily integrity. *In re Storar, supra.*

### A
#### RIGHT OF PRIVACY

The United States Supreme Court has identified a right of privacy emanating from the penumbra of the specific guaranties of the Bill of Rights and from the language of the First, Fourth, Fifth, Ninth and Fourteenth Amendments. *Griswold v. Connecticut,* 381 U.S. 479, 484, 14 L. Ed. 2d 510, 85 S. Ct. 1678 (1965); *Roe v. Wade,* 410 U.S. 113, 35 L. Ed. 2d 147, 93 S. Ct. 705 (1973). In *Roe,* the United States Supreme Court determined that the right of privacy was a personal right "broad enough to encompass a woman's decision whether or not to terminate her pregnancy", subject only to countervailing, compelling state interests. *Roe v. Wade, supra* at 153. While the perimeters of this right have not been defined, the *"freedom to care*

*for one's health and person"* falls within its purview. *Doe v. Bolton,* 410 U.S. 179, 213, 35 L. Ed. 2d 201, 93 S. Ct. 739 (1973) (Douglas, J., concurring).

From these holdings, our sister states have reasoned that the privacy right is "broad enough to encompass a patient's decision to decline medical treatment under certain circumstances". *In re Quinlan, supra* at 40; *see also Leach,* 426 N.E.2d at 813; *Storar,* 438 N.Y.S.2d at 273; *Saikewicz,* at 740.

> The decision by the incurably ill to forego medical treatment and allow the natural processes of death to follow their inevitable course is so manifestly a "fundamental" decision in their lives, that it is virtually inconceivable that the right of privacy would *not* apply to it.

*In re Eichner,* 73 A.D.2d 431, 459, 426 N.Y.S.2d 517 (1980), *aff'd sub nom. In re Storar, supra* (hereinafter *Eichner*); *see also* Cantor, *A Patient's Decision To Decline Life-Saving Medical Treatment: Bodily Integrity Versus the Preservation of Life,* 26 Rutgers L. Rev. 228 (1973); Comment, *Roe v. Wade and In re Quinlan: Individual Decision and the Scope of Privacy's Constitutional Guarantee,* 12 U.S.F. L. Rev. 111 (1977).

In Washington, we have previously recognized this right of privacy in the context of an abortion decision. *State v. Koome,* 84 Wn.2d 901, 530 P.2d 260 (1975). In harmony with other jurisdictions, we now hold that an adult who is incurably and terminally ill has a constitutional right of privacy that encompasses the right to refuse treatment that serves only to prolong the dying process, given the absence of countervailing state interests. Support for this holding is also found in our state constitution. Const. art. 1, § 7.

This privacy right, if founded on the federal constitution and applied to the states through the Fourteenth Amendment, extends only to situations where state action exists. *United States v. Stanley,* 109 U.S. 3, 11, 27 L. Ed. 835, 3 S. Ct. 18 (1883); *Long v. Chiropractic Soc'y,* 93 Wn.2d 757, 613 P.2d 124 (1980). Other jurisdictions have approached this limitation by presuming state action is involved with-

out expressly addressing the issue. *See Saikewicz,* at 739; *Quinlan,* at 40. The one court directly addressing the issue found an implied state presence sufficient to constitute state action. *Eichner,* at 460–61.

The existence of "state action" for constitutional purposes depends on "whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 351, 42 L. Ed. 2d 477, 95 S. Ct. 449 (1974). Here, the presence of the State is manifested by its capability of imposing criminal sanctions on the hospital and its staff (RCW 9A.32.030), by its licensing of physicians (RCW 18.71.020), by the required involvement of the judiciary in the guardianship appointment process (see part V(A) and (D)) and by the State's parens patriae responsibility to supervise the affairs of incompetents. RCW 11.88.010; *cf. Parham v. J.R.,* 442 U.S. 584, 61 L. Ed. 2d 101, 99 S. Ct. 2493 (1978). Taken together, these factors show a sufficient nexus between the State and the prohibitions against withholding or discontinuance of life sustaining treatment to call into play the constitutional right of privacy.

### B
### RIGHT TO BE FREE FROM BODILY INVASION

The common law right to be free from bodily invasion is an alternative basis for the right to refuse life sustaining treatment. *See Saikewicz; Storar.* Historically, an operation without authorization constituted an assault and battery, as well as malpractice. *Physicians' & Dentists' Business Bur. v. Dray,* 8 Wn.2d 38, 111 P.2d 568 (1941).

This right to be free from nonconsensual invasions of one's bodily integrity is the basis for the doctrine of informed consent which requires physicians to disclose to a patient all material facts and risks concerning the patient's condition, thus enabling the patient to make an informed choice regarding the proposed treatment. *Gates v. Jensen,*

92 Wn.2d 246, 595 P.2d 919 (1979); RCW 7.70.050. Such information must include the possibility of alternative treatment or no treatment at all. *ZeBarth v. Swedish Hosp. Med. Ctr.,* 81 Wn.2d 12, 499 P.2d 1, 52 A.L.R.3d 1067 (1972); RCW 7.70.050(3)(d). Thus, freedom of choice with respect to medical treatment encompasses the right to refuse life sustaining treatment in certain circumstances.

## C
### STATE INTERESTS

This right to refuse treatment, be it founded on constitutional or common law precepts, is not absolute, for the state has an interest in protecting the sanctity of the lives of its citizens. *See Saikewicz; Quinlan.* This state interest has been identified in four areas: (1) the preservation of life; (2) the protection of interests of innocent third parties; (3) the prevention of suicide; and (4) maintenance of the ethical integrity of the medical profession. *Saikewicz,* at 741.

The most significant state interest, the preservation of life, has prevailed to require *lifesaving* treatment for nonconsenting patients. *See In re President & Directors of Georgetown College, Inc.,* 331 F.2d 1000 (D.C. Cir.), *cert. denied,* 377 U.S. 978, 12 L. Ed. 2d 746, 84 S. Ct. 1883 (1964); *John F. Kennedy Mem. Hosp. v. Heston,* 58 N.J. 576, 279 A.2d 670 (1971). This interest weakens, however, in situations where continued treatment serves only to prolong a life inflicted with an incurable condition. *See Quinlan,* at 41; *Saikewicz,* at 742; Note, *In re Quinlan: One Court's Answer to the Problem of Death With Dignity,* 34 Wash. & Lee L. Rev. 285, 297 (1977).

In *Quinlan,* the court balanced the degree of bodily invasion against the State's interest in preserving life. *Quinlan,* at 40–41. For Karen Quinlan, the degree of bodily invasion was great, since she required a respirator, an intravenous feeding apparatus, a catheter, and intensive nursing care. The court concluded that Karen's privacy right outweighed the State's interest.

Similar intrusive care was required for Bertha Colyer. Therefore, applying the *Quinlan* balancing test, we conclude that Bertha Colyer's privacy right was greater than the State's interest in preserving her life.

The other identified state interests do not mandate a different conclusion. Bertha Colyer had no children and her immediate family, consisting of her sisters, joined in her husband's request to remove the life sustaining mechanisms. Hence, no third party interests needed to be protected. *Compare In re President & Directors of Georgetown College, Inc., supra* (blood transfusion ordered for mother of small child) *with In re Osborne,* 294 A.2d 372 (D.C. 1972) (refusal of lifesaving treatment by competent adult upheld where provisions were made for the children). Nor was prevention of suicide a pertinent consideration here. A death which occurs after the removal of life sustaining systems is from natural causes, neither set in motion nor intended by the patient. *See Saikewicz,* at 743 n.11; Byrn, *Compulsory Lifesaving Treatment for the Competent Adult,* 44 Fordham L. Rev. 1 (1975).

Finally, the State's interest in the maintenance of the ethical integrity of the medical profession is not at odds with this result.

> [T]he prevailing ethical practice seems to be to recognize that the dying are more often in need of comfort than treatment. Recognition of the right to refuse necessary treatment in appropriate circumstances is consistent with existing medical mores; such a doctrine does not threaten either the integrity of the medical profession, the proper role of hospitals in caring for such patients or the State's interest in protecting the same. It is not necessary to deny a right of self–determination to a patient in order to recognize the interests of doctors, hospitals, and medical personnel in attendance on the patient.

*Saikewicz,* at 743–44. Thus, we conclude there were no compelling state interests opposing the removal of life sustaining mechanisms from Bertha Colyer that outweighed her right to refuse such treatment.

## IV

The next issue is who may exercise this right. A competent patient may refuse treatment under the informed consent doctrine. RCW 7.70.050. Moreover, a competent patient may ensure with a directive that life sustaining treatment will be withheld or withdrawn, should he or she subsequently become incompetent. RCW 70.122.

An incompetent's right to refuse treatment should be equal to a competent's right to do so. No court has denied an individual this right because of incompetency to exercise it:

> [H]er right of privacy . . . should not be discarded solely on the basis that her condition prevents her conscious exercise of the choice.

*In re Quinlan,* 70 N.J. 10, 41, 355 A.2d 647, *cert. denied,* 429 U.S. 922, 50 L. Ed. 2d 289, 97 S. Ct. 319 (1976).

> The recognition of that [privacy] right must extend to the case of an incompetent, as well as a competent, patient because the value of human dignity extends to both.

*Superintendent of Belchertown State Sch. v. Saikewicz,* 373 Mass. 728, 745, 370 N.E.2d 417 (1977). The question is, therefore, who may exercise an incompetent's right to refuse life sustaining treatment if no directive exists and the incompetent is unable to do so.

On this issue, the opinions from other jurisdictions diverge. On the one hand, the *Quinlan* court held that, to prevent destruction of the privacy right because of incompetency, the guardian, Karen's father, was to render *his best judgment* as to whether Karen would have exercised the right if she were able. *Quinlan,* at 41. As a foundation for this conclusion, the court examined the character and general suitability of the father as a guardian. Evidence of the high degree of familial love between father and daughter, and the "very sincere, moral, ethical and religious" character of Mr. Quinlan convinced the court that he was eminently qualified for guardianship over his daughter. *Quinlan,* at 29–30, 53. This then led to the conclusion that

the guardian's best judgment concerning the patient's choice to exercise her privacy right would, in this circumstance, best preserve this right.

While not abdicating jurisdiction over justiciable controversies, the *Quinlan* court maintained that, as a general practice, such decisions "should be controlled primarily within the patient–doctor–family relationship". *Quinlan,* at 50.

[A] practice of applying to a court to confirm such decisions would generally be inappropriate, not only because that would be a gratuitous encroachment upon the medical profession's field of competence, but because it would be impossibly cumbersome.

*Quinlan,* at 50. The *Quinlan* court also advocated the establishment of hospital ethics committees, composed of physicians, social workers, attorneys and theologians, to assist in the decision, to screen against less worthy motives of the guardian or the physicians, and to distribute responsibility. *Quinlan,* at 49–50.

*Saikewicz* is the leading case in the other camp, those jurisdictions requiring judicial intervention in every case involving the withdrawal or withholding of life sustaining treatment from an incompetent. *See also Severns v. Wilmington Med. Ctr. Inc.,* 421 A.2d 1334 (Del. 1980); *Leach v. Akron Gen. Med. Ctr.,* 68 Ohio Misc. 1, 426 N.E.2d 809 (1980). This approach has been labeled "substituted judgment," for the *court* determines, based on the evidence presented, what treatment the incompetent would have chosen. *Saikewicz.* A judicial standard of clear and convincing proof of the patient's desire to refuse treatment has usually been required. *Leach.*

Both *Saikewicz* and *Quinlan* have been the subject of numerous articles in both legal and medical journals. While aspects of both opinions have been criticized, the *Saikewicz* opinion has been more harshly condemned. Many fear that routine court involvement will disrupt the work of doctors in ways that will detrimentally affect the treatment given to patients generally. *See* Relman, *The Saikewicz Decision:*

*Judges as Physicians,* 298 New Eng. J. Med. 508 (1978). In truth, medical treatment of the terminally ill in Massachusetts in the aftermath of *Saikewicz* has been in a state of general confusion. *See* Annas, *Reconciling Quinlan and Saikewicz: Decision Making for the Terminally Ill Incompetent,* 4 Am. J. L. & Med. 367, 387–94 (1979).[1]

At least one author has attempted to reconcile the seemingly divergent views in *Quinlan* and *Saikewicz.* Annas, *supra.* His thesis is that the factual differences between the two cases explain the different procedural requirements established in each. In *Saikewicz,* the patient was a 67–year–old mentally retarded man with leukemia; the issue was whether chemotherapy treatment could be withheld. These facts presented the *Saikewicz* court with issues very different from those in the *Quinlan* case. As Mr. Saikewicz had always been severely retarded, there was no way for a guardian to ascertain what his choice would have been, were he competent. Therefore, the concept of a guardian using his best judgment to exercise the patient's personal choice was inapplicable. Also, the *Saikewicz* court was asked to reach an unusual result; most people elect chemotherapy treatment. Therefore, the court was required to find special reasons why Mr. Saikewicz would choose to refuse the treatment.[2] In contrast, the *Quinlan* court found that the majority of society, if in Karen's position, would have chosen to have the life support systems withdrawn.

---

[1]For example, another appellate court decision was necessary to establish that court approval was not required to use a DNR (Do Not Resuscitate) code for a terminally ill, comatose, and elderly patient. *In re Dinnerstein,* 6 Mass. App. Ct. 466, 380 N.E.2d 134 (1978). Two years later, in *In re Spring,* 380 Mass. 629, 405 N.E.2d 115 (1980), the Massachusetts court attempted to alleviate the confusion by stating that *Saikewicz* did not establish "any requirement of prior judicial approval that would not otherwise exist", and listed nearly a dozen general factors to be considered in deciding whether or not a prior court order was necessary. *In re Spring, supra* at 636. It remains to be seen whether or not these attempts at clarification dissipate the confusion generated by *Saikewicz.*

[2]This they did with reference to his age, his inability to understand and cooperate with the treatment, the probable side effects and suffering, and the low probability of remission. *Saikewicz,* at 753–54.

*Quinlan,* at 41–42. Finally, the decision in *Saikewicz* involved the refusal of life *prolonging* treatment, for chemotherapy offered a reasonable chance of temporary remission of the disease. Thus, the issue was not one of artificially sustaining a life for an indefinite period. Recognizing these differences, the perceived need for judicial intervention in *Saikewicz* is not surprising.

We are not faced with facts similar to those in *Saikewicz,* however. Bertha Colyer's situation is much more akin to that of Karen Quinlan: she had been competent prior to her heart attack, she had close family members who were familiar with her character and her beliefs, and her treatment was of a life sustaining nature. Therefore, under these circumstances, we choose a course similar to that in *Quinlan* and hold that judicial intervention in every decision to withdraw life sustaining treatment is not required.

While we do not accept the *Quinlan* court's view that judicial intervention is an encroachment upon the medical profession, we do perceive the judicial process as an unresponsive and cumbersome mechanism for decisions of this nature. This fact is borne out by a number of the leading cases in which arguments were heard and opinions written long after the patient had died. *See In re Storar,* 52 N.Y.2d 363, 420 N.E.2d 64, 438 N.Y.S.2d 266 (1981); *In re Spring,* 380 Mass. 629, 405 N.E.2d 115 (1980). Obviously, the court system could not respond in a timely manner to the relief sought in those situations. Moreover, the formalities of a legal determination might chill a guardian's resolve to assert the rights of his ward. *See* Note, *In re Quinlan: One Court's Answer to the Problem of Death With Dignity,* 34 Wash. & Lee L. Rev. 285, 307 (1977).

In cases where physicians agree on the prognosis and a close family member uses his best judgment as a guardian to exercise the rights of the incompetent, intervention by the courts would be little more than a formality. Therefore, as a general principle, we hold that a decision to terminate life sustaining treatment, under the circumstances pre-

sented here, does not require judicial intervention.[3] We in no way abdicate, however, the authority of the courts to hear and decide any such case brought before them. Nor do we maintain that judicial intervention would not be required under facts similar to *Saikewicz*; such is not the issue before us now.

## V

While we hold that courts need not be involved in individual decisions, we recognize that the court, or the Legislature, must establish guidelines to be followed to ensure that the rights of all parties are adequately protected. Therefore, we turn now to the issue of the procedures to be followed in reaching a decision to withdraw life sustaining treatment. We approach this task by examining separately the roles of (a) the guardian, (b) the guardian ad litem, (c) the physicians, and (d) the courts.

## A

### THE GUARDIAN

■■■ Under the laws governing guardianships, a guardian is required to assert the "rights and best interests" of the incompetent person. RCW 11.92.040(3). We hold now that this provision also enables a guardian to use his best judgment and exercise, when appropriate, an incompetent's personal right to refuse life sustaining treatment. *See* Cantor, 30 Rutgers L. Rev. at 252; Note, 34 Wash. & Lee L. Rev. at 300–02. This holding embodies the views of this court, as stated above: (1) an individual's right of privacy or right to be free from bodily invasion encompasses the right to refuse life sustaining treatment; (2) this right inures equally to the incompetent patient as to the competent one; and (3) the judicial process is a cumbersome forum for exercising such a personal right if an appropriate guardian is available.

---

[3]For the views of other authors on this issue, *see, e.g.,* Cantor, *Quinlan, Privacy, and the Handling of Incompetent Dying Patients,* 30 Rutgers L. Rev. 243 (1977); Relman, *The Saikewicz Decision: A Medical Viewpoint,* 4 Am. J. L. & Med. 233 (1978); Annas.

Although the appointment of a guardian is a judicial process, once a guardian is appointed, the courts need not be involved in the substantive decision to refuse life sustaining treatment. The *Quinlan* court accepted that the powers of the guardian encompass such a decision, and commentators addressing the nonjudicial decisionmaking process do not question this premise. *See* Note, 34 Wash. & Lee L. Rev. 285; Cantor, *supra.*

Our guardianship statute provides that a guardian of a person has the power "to care for and maintain the incompetent or disabled person, *assert his or her rights and best interests,* and provide timely, informed consent to necessary medical procedures". (Italics ours.) RCW 11.92.040(3). As refusal of life sustaining treatment is an individual's personal right, we conclude that under this provision the guardian has the power to assert such a right.

We note that RCW 11.92.040 lists certain procedures to which the guardian cannot consent without a court order. These exceptions to the general grant of power are:

(a) Therapy or other procedure which induces convulsion;
(b) Surgery solely for the purpose of psychosurgery;
(c) Amputation;
(d) Other psychiatric or mental health procedures which are intrusive on the person's body integrity, physical freedom of movement, or the rights set forth in RCW 71.05.370.

RCW 11.92.040(3). These exceptions do not seem applicable to the situation we are addressing here. All of the exclusions listed, with the possible exception of amputation, refer to treatments for psychological purposes. In addition, they refer to intrusive treatment, not to the refusal of treatment. Furthermore, because they are express exclusions in a statute, they must be construed narrowly. *Jepson v. Department of Labor & Indus.,* 89 Wn.2d 394, 573 P.2d 10 (1977); *In re Monks Club, Inc.,* 64 Wn.2d 845, 394 P.2d 804 (1964). We conclude, therefore, that the decision to refuse life sustaining treatment is one that falls under the general powers of the guardian and does not

routinely require a court order.

In giving the guardian the authority to make such a judgment, we are aware of the danger that a guardian might act on the basis of less than worthy motives, *i.e.*, an interest in the incompetent's estate or a desire to alleviate the financial burden of the life sustaining treatment. We believe, however, that safeguards exist within the laws controlling guardianships which protect against such dangers without requiring routine court intervention in the termination decision itself. For example, a guardian of an incompetent is appointed by the superior court and is at all times under the general direction and control of the court. RCW 11.88.010; RCW 11.92.010. The court is said to be the superior guardian of the ward, while the person appointed guardian is deemed to be an officer of the court. *Seattle–First Nat'l Bank v. Brommers*, 89 Wn.2d 190, 570 P.2d 1035 (1977). Moreover, the guardianship statute provides for notice to various persons connected with the alleged incompetent. RCW 11.88.040. Finally, a guardian ad litem is appointed to protect the interests of the incompetent during the guardian petition proceedings. RCW 11.88.090; see part V(B), *infra*.

These procedures serve to protect against too precipitous a decision or the appointment of one with less than proper motives. Moreover, we do not perceive them as being overly burdensome; a guardianship hearing must be held within 45 days of the filing of the petition (RCW 11.88.030(3)), and the proceedings may be expedited if the appointment is uncontested. RCW 11.88.040. Thus, judicial participation at this juncture affords minimal intrusion into the personal decision regarding treatment, but nevertheless serves to protect against abuse.[4]

---

[4]As a general rule a guardian may not place himself in a position in which his personal interests conflict with those of his ward. 39 C.J.S. *Guardian and Ward* § 98 (1976). While we are aware that a family member who petitions to be a guardian may be a beneficiary of the estate of the incompetent, this alone should not disqualify the petitioner. In most instances, the familial relationship will strengthen, and not undermine, the guardian's best judgment in exercising the

Once appointed, the guardian's duty is to use his best judgment in deciding whether or not to assert the *personal* right of the incompetent to refuse life sustaining treatment. The guardian's familiarity with the incompetent's character and personality, prior statements, and general attitude towards medical treatment will assist in making that judgment.

The probative value of prior statements by the incompetent regarding refusal of life sustaining treatment has been treated differently by different courts. In *Quinlan,* the court found that Karen's statements to friends to the effect that she would not want to be kept alive on a life sustaining system were without sufficient probative weight. *In re Quinlan,* 70 N.J. 10, 41, 355 A.2d 647, *cert. denied,* 429 U.S. 922, 50 L. Ed. 2d 289, 97 S. Ct. 319 (1976). On the other hand, another court considered similar statements, made by the patient while competent, to be probative. *In re Eichner,* 73 A.D.2d 431, 471–72, 426 N.Y.S.2d 517 (1980), *aff'd sub nom. In re Storar,* 52 N.Y.2d 363, 420 N.E.2d 64, 438 N.Y.S.2d 266 (1981).[5]

These positions may be reconciled by their facts, however. Because of her youth and the casual nature of her conversations, Karen Quinlan's statements were logically regarded as having little probative weight in determining what her choice would have been given her situation. In contrast, Brother Fox, the patient in *Eichner,* had expressed his opinion during discussions focusing on the Karen Quinlan situation, and he reiterated these views upon learning that he was in need of the operation that ultimately rendered him incompetent. *Eichner,* at 471. We conclude that prior statements may be probative in determining the wishes of an incompetent patient, with the age and maturity of the patient, the context of the statements,

---

personal rights of the incompetent.

[5]The *Eichner* court rejected hearsay objections, declaring that such statements fell under the state of mind exception.

and the connection of the statements to the debilitating event being factors to be weighed by the guardian.

There is no evidence that Bertha Colyer explicitly expressed her desire to refuse life sustaining treatment. Nevertheless, her husband and her sisters agreed that Bertha Colyer was a very independent woman, that she disliked going to doctors, and, if able to express her views, that she would have requested the treatment be withdrawn. Given the unanimity of the opinions expressed by Bertha's closest kin, together with the absence of any evidence of any ill motives, we are satisfied that Bertha's guardian was exercising his best judgment as to Bertha's personal choice when he requested the removal of the life support system.

### B
### The Guardian Ad Litem

The guardian ad litem serves an important safeguard function. Appointed during the guardianship proceeding, a guardian ad litem represents the best interests of the incompetent. RCW 11.88.090. To fulfill this role, the statute requires such a person "be free of influence from anyone interested in the result of the proceeding". RCW 11.88.090(2)(a).

Among the guardian ad litem's duties enumerated in the statute is the duty to provide the court with a written "evaluation of the appropriateness of the guardian . . . whose appointment is sought". RCW 11.88.090(3)(b)(ii). Under circumstances such as these, this evaluation should focus on the closeness of the relationship between the petitioning party and the incompetent, and any evidence of less than salutary motives. The guardian ad litem need not necessarily play an adversarial role with respect to the guardian's petition; his role is rather to ensure that the incompetent's interests are being protected.

While the petition is pending, the guardian ad litem has the authority to consent to emergency lifesaving medical services. RCW 11.88.090(5). Upon the appointment of a guardian, all authority to act on behalf of the incompetent

shifts to the guardian (*see* RCW 11.92.040) and, as judicial intervention in each substantive decision regarding life sustaining treatment is not required, the guardian ad litem would be dismissed at this time. *See* RCW 11.88.090(6).

If judicial intervention subsequent to the guardianship appointment is required, however, a guardian ad litem would again be appointed to protect the interests of the incompetent in that proceeding. See part V(D), *infra*. The guardian ad litem's function in this context would be to discover all the facts relevant to the decision to withdraw life sustaining treatment and present them to the court. Such facts would include, but are not necessarily limited to: (a) facts about the incompetent, *i.e.*, age, cause of incompetency, relationship with family members and other close friends, attitude and prior statements concerning life sustaining treatment; (b) medical facts, *i.e.*, prognosis for recovery, intrusiveness of treatment, medical history; (c) facts concerning the State's interest in preserving life, *i.e.*, the existence of dependents, other third party interests; and (d) facts about the guardian, the family, other people close to the incompetent, and the petitioner, *i.e.*, their familiarity with the incompetent, their perceptions of the incompetent's wishes, any potential for ill motives. Thus, the guardian ad litem would not necessarily play a true adversarial role, but would serve as an investigator and a reporter of relevant facts to the court.[6]

## C
### THE PHYSICIANS

█ Concomitant with the guardian's exercise of the patient's right to refuse treatment is the medical determination that the patient is incurable and will not return to a

---

[6]To compare the guardian ad litem's role in other jurisdictions which require routine judicial intervention in the substantive decisionmaking process, *see, e.g., Superintendent of Belchertown State Sch. v. Saikewicz*, 373 Mass. 728, 370 N.E.2d 417 (1977); Baron, *Assuring "Detached but Passionate Investigation and Decision": The Role of Guardians Ad Litem in Saikewicz–Type Cases*, 4 Am. J. L. & Med. 111 (1978).

sapient state. If the patient's condition is hopeless or there is "no reasonable possibility of returning to a cognitive, sapient state," the patient's right of privacy outweighs the State's interest in preserving life. *Superintendent of Belchertown State Sch. v. Saikewicz,* 373 Mass. 728, 370 N.E.2d 417 (1977); Annas, *Reconciling Quinlan and Saikewicz: Decision Making for the Terminally Ill Incompetent,* 4 Am. J. L. & Med. 367 (1979).

The prognosis determination is a medical one. Nonetheless, this prong of the decisionmaking process must also incorporate safeguards. While the vast majority of physicians conscientiously adhere to their professional oaths and view their patients' interests as paramount, such a momentous decision requires some protection against those who might be motivated by other interests. The *Quinlan* court recommended a hospital ethics committee, made up of physicians, social workers, attorneys and theologians, to oversee this decision. This type of a committee has been criticized, however, for its amorphous character, for its use of nonmedical personnel to reach a medical decision, and for its bureaucratic intermeddling. Annas, at 379; Cantor, *Quinlan, Privacy, and the Handling of Incompetent Dying Patients,* 30 Rutgers L. Rev. 243, 255 (1977); Collester, *Death, Dying and the Law: A Prosecutorial View of the Quinlan Case,* 30 Rutgers L. Rev. 304, 320–21 (1977); Hirsh & Donovan, *The Right To Die: Medico–Legal Implications of In re Quinlan,* 30 Rutgers L. Rev. 267, 280–85 (1977). We agree that such an administrative body does not best serve the desired function.

In actuality, what is needed is a prognosis board to confirm the attending physician's diagnosis. *See* Annas, at 369; *Eichner,* at 476. Concurrence by professional colleagues, who are not attending physicians but who nonetheless have an understanding of the patient's condition, would protect against erroneous diagnoses as well as questionable motives. *See* Relman, *The Saikewicz Decision: A Medical Viewpoint,* 4 Am. J. L. & Med. 233, 242 (1978). Thus, we recommend that in future decisions of this nature, there

should be unanimous concurrence from a prognosis board or committee. Such a committee should consist of no fewer than two physicians with qualifications relevant to the patient's condition, plus the attending physician.[7] These physicians should agree there is no reasonable medical probability that the patient will return to a sapient state.[8]

Disagreement among the physicians on the prognosis committee may foreclose any action to withhold or withdraw treatment without court intervention. In instances of

---

[7]We choose not to dictate selection of the members of a prognosis board. A case–by–case selection would be preferable to a standing committee, however, since a professional understanding of the patient's condition would be an important factor to consider. Selection may be administered by the hospital or another appropriate body. In addition, if no selection mechanism exists, the court may appoint a committee.

[8]The dissent prefers an ethics committee to a prognosis committee. We perceive, however, that a determination of the likelihood of a patient's recovery to a cognitive, sapient state is a uniquely medical one. Although the presence of theologians and social workers would serve to diffuse responsibility for the decision, such a committee may be unable to reach a consensus, or in the alternative, it may use the bureaucratic format, wherein no one is singularly responsible, to treat marginal cases too lightly. Either way, the use of such a committee has many substantive and procedural problems and serves to bureaucratize an essentially personal and private decision. Therefore, we take heed of the criticisms in the literature leveled against such a committee, and choose instead to institute a prognosis board, which will focus solely on the medical determination. *See* Annas; Cantor; Collester; Hirsch & Donovan.

We also note in this footnote the dissent's suggestion that a 120–day waiting period be required prior to petitioning a committee for review. While we recognize that these decisions must not be made precipitantly, we believe the prognosis board, rather than the court, is the proper body to determine the time at which it can be said there is no reasonable probability that a patient will recover. While other cases determined the issue at other time intervals, this was simply a function of when the case was brought before the court. None of the cases from other jurisdictions imposed such a waiting period on future cases. *See In re Quinlan*, 70 N.J. 10, 355 A.2d 647, *cert. denied*, 429 U.S. 922, 50 L. Ed. 2d 289, 97 S. Ct. 319 (1976); *Severns v. Wilmington Med. Ctr., Inc.*, 421 A.2d 1334 (Del. 1980); *In re Storar*, 52 N.Y.2d 363, 420 N.E.2d 64, 438 N.Y.S.2d 266 (1981); *Leach v. Akron Gen. Med. Ctr.*, 68 Ohio Misc. 1, 426 N.E.2d 809 (1980). Moreover, the procedure proposed herein guards against hurried decisions by requiring the appointment of a guardian and a determination by the prognosis board. Furthermore, it is implicit in our opinion that any change in the patient's condition prior to termination of the life sustaining treatment would require a review of the decision by the guardian and the prognosis board.

disagreement, application could be made to the court to resolve the dispute with the aid of expert testimony. Should the testimony show, by clear and convincing evidence, that the patient's condition was incurable and there was no reasonable medical probability of returning to a cognitive, sapient state, the court could then assert the patient's right to refuse treatment.

In Bertha Colyer's case, two physicians agreed she was incurable and probably would never recover to a sapient state. Each physician had appropriate qualifications to understand her condition. Moreover, neither physician had treated her previously, therefore neither appeared to have any interest in the decision outside the medical considerations. In this instance, given the lack of existing guidelines, we hold their consensus was sufficient.

## D
### The Court

The final safeguard in this procedure is the court itself. The court will always be involved in the appointment of the guardian. Moreover, while the court need not play a role in every substantive decision to withhold treatment, there will be instances when the detached opinion of the judiciary will be required. For example, if there is disagreement among family members as to the incompetent's wishes or among the physicians as to the prognosis, if the patient has always been incompetent so that his wishes cannot be known, if there is evidence of wrongful motives or malpractice, of if there is no family member to serve as guardian, the court may be required to intervene. *See* Coburn, *In re Quinlan: A Practical Overview*, 31 Ark. L. Rev. 59 (1977); Relman, 4 Am. J. L. & Med. at 241. Any participant in the decision, the guardian, a physician or the hospital, may petition for court intervention, as may a member of the incompetent's family.

If a court determination is required, a guardian ad litem must be appointed to ascertain and protect the interests of the patient. At such a proceeding, the focus would

be a determination of the rights and wishes of the incompetent. The appointment of the guardian would be presumed valid, unless there is a showing of clear error or an abuse of discretion, and the conclusion of the prognosis board would also be presumed correct. On the basis of information presented to it, the court would determine, in its best judgment, whether the facts demonstrated that the incompetent would have chosen to exercise his or her right to refuse treatment, if he or she were able to do so.

To summarize, the procedure we propose for a determination to withhold or withdraw life sustaining treatment is as follows:

1. A unanimous concurrence by a prognosis board, made up of the attending physician and no fewer than two other disinterested physicians with relevant qualifications, that the patient's condition is incurable and there is no reasonable medical probability of returning to a cognitive, sapient state, or in the event of disagreement on the prognosis board, a court decision making such findings by clear and convincing evidence;

2. Court appointment of a guardian for the incompetent person pursuant to the procedure set forth in RCW 11.88 and RCW 11.92, including appointment of a guardian ad litem to represent the best interests of the incompetent in that proceeding;

3. Exercise of the patient's right of privacy and freedom from bodily invasion by the guardian, if it is the guardian's best judgment that the patient, if competent to make the decision, would choose to have the life sustaining treatment removed;

4. If required, a court determination of the rights and wishes of the incompetent, with a guardian ad litem appointed to represent the incompetent patient and to present all relevant facts to the court.

## VI

▆ A final issue that must be addressed is the potential criminal liability of those involved in the decision to termi-

nate life sustaining support.[9] Under Washington's criminal code, homicide is "the killing of a human being by the act, procurement or omission of another" (RCW 9A.32.010), and it is murder in the first degree when, "[w]ith a premeditated intent to cause the death of another person, [one] causes the death of such person". RCW 9A.32.030(1)(a). Thus, the potential for criminal liability for withdrawing life sustaining mechanisms appears to exist. We conclude, however, that such action, if in good faith compliance with the procedure set forth above, would not be criminal.

The *Quinlan* court reached this same conclusion based on two alternative theories: (1) that the ensuing death would not be caused by the removal of the treatment, but rather by expiration from existing natural causes, hence it would not be homicide; or (2) even if it were homicide, it would not be unlawful because the action would be based on the exercise of a constitutional right and, as such, would be protected from criminal prosecution. *In re Quinlan,* 70 N.J. 10, 51–52, 355 A.2d 647, *cert. denied,* 429 U.S. 922, 50 L. Ed. 2d 289, 97 S. Ct. 319 (1976); *see Stanley v. Georgia,* 394 U.S. 557, 22 L. Ed. 2d 542, 89 S. Ct. 1243 (1969). We concur in this reasoning.

In addition, Washington's Natural Death Act excludes from criminal liability those who act in good faith and in accordance with a directive complying with the statutory requirements. RCW 70.122.060. It further states that acts in accordance with a directive are not deemed suicide, they should have no effect on life or health insurance policies, and the cause of death shall be that which placed the patient in a terminal condition. RCW 70.122.070 and .080. We believe that the same principles should apply when the patient's right to refuse life sustaining treatment is exercised in accordance with this opinion.

---

[9]The issue of potential civil liability was not raised by the parties, therefore we will not comment upon it. *See Johnson v. Morris,* 87 Wn.2d 922, 931, 557 P.2d 1299 (1976).

## VII

As a concluding note, the limitations of this opinion will be delineated. The issue before us is the removal of life sustaining systems from an incurable patient. The technical term for this is antidysthanasia. Hyland & Baime, *In re Quinlan: A Synthesis of Law and Medical Technology*, 8 Rut.–Cam. L. Rev. 37, 52–53 (1976). Nothing in this opinion is intended to authorize or condone euthanasia, the unnatural termination of a patient's life. Nor do we reach the question today of the propriety of withdrawing or withholding life prolonging or curative treatment from an incompetent patient, even if the patient is terminally ill. We defer these issues to the Legislature or to the time when they are squarely before us.

Furthermore, we invite the Legislature to address this sensitive issue. While the judiciary has the power and authority to decide such issues, our decisions are limited by the facts before us. As these issues necessarily involve society's moral standards as well as legal and medical issues, the Legislature is the body most capable of assessing the views of the people of this state.

WILLIAMS, C.J., STAFFORD, UTTER, and DIMMICK, JJ., and BRYAN and CUNNINGHAM, JJ. Pro Tem., concur.

DORE, J. (dissenting)—I would have remanded this matter to the ethics committee of the hospital for its review. In the absence of an ethics committee, I would have suggested the employment of a committee, its composition and procedural operation discussed more fully below. In any event, I would have deferred any action of the committee for a 120–day period following the patient becoming comatose.

I concede the majority had jurisdiction to grant this petition on the basis of the constitutional right of privacy, *cf. Griswold v. Connecticut,* 381 U.S. 479, 14 L. Ed. 2d 510, 85 S. Ct. 1678 (1965); *In re Quinlan,* 70 N.J. 10, 355 A.2d 647, *cert. denied,* 429 U.S. 922, 50 L. Ed. 2d 289, 97 S. Ct. 319 (1976). I believe, however, it erred in failing to require

an appreciable amount of time to lapse between the comatose condition of the incompetent and the removal of the life supporting mechanism. In the subject case, only 25 days separated the time of the accident on March 8, 1982, and the entry of this court's order dissolving the injunction. Only 16 days elapsed between the time of the commencement of Colyer's comatose condition and the testimony of the two physicians upon which this court based its decision. In my opinion, 16 or 25 days is not an acceptable time period.

The issue here is whether Colyer, within the bounds of reasonable medical certainty or probabilities, would have recovered brain functions. Some physicians have testified in reported cases that a 4– to 6–month comatose period is used to determine whether there is any improvement in the incompetent, to reach their opinion in testifying as to whether the incompetent would recover a cognitive or sapient existence. *Severns v. Wilmington Med. Ctr., Inc.,* 421 A.2d 1334 (Del. 1980).

I

I believe it would be helpful to better understand this case and subject matter to review some of the medical and lay testimony.

One of Colyer's treating physicians, Dr. Roland Trenouth, a cardiac specialist, saw her daily from March 8 to March 24 at St. Luke's Hospital. On March 24, 16 days after his initial examination, he testified:

A. I have seen no improvement in the patient over the essentially two weeks or 15 days that the patient has been in the hospital. There have been no signs of neurological improvement. The patient has shown no signs of waking up or lightening of her coma.

She remains in a persistent vegetative state. She is unable to take adequate attempts to breathe, to go off the respirator, and yet her other vital signs, such as heart beat, blood pressure and other things, remain quite stable.

Report of Proceedings, at 4. He continued:

I think, based on my previous experience and the medical literature, that the *likelihood of a patient in this condition recovering would be extremely small,* and I'm not aware of any patient, or any documented cases where a patient under these circumstances, after a cardiac arrest, has awakened and been able to eventually have full recovery of mental faculties.

Report of Proceedings, at 5.

He further testified he doubted any significant amount of brain function could be restored. Only some very minor improvement would ever be expected at the very best. Dr. Trenouth continued, saying, "I would think only an extremely small chance that she would improve enough that she could be able to go off the respirator and sustain life, and again, she would not have return of normal faculties". Report of Proceedings, at 6.

Dr. Walter Ruf, a neurologist, saw her twice, the first time on March 9, 1982, and the second on March 24, 1982. On the 9th, he found Mrs. Colyer in a coma. She remained in a coma. He testified:

She's been totally unresponsive to any sensory stimulus whatsoever. Most of her brain stem function is gone except for the very lower portion of the brain stem, where there is some minimal reflex movement, and then she does have some reflexes in her extremities, and these have remained unchanged since she's been in.

Report of Proceedings, at 8.

Dr. Ruf also performed an EEG which showed some minimal activity. The EEG monitors the cortical function, which is slightly higher than the brain stem. He further testified that he reexamined her on March 24 and found she had lost one of the brain stem functions but was otherwise unchanged. He was asked:

Q When you say there was some function in the lowermost portion of the brain stem, what in the body does that control?

A This controls breathing, and she's had persistent chewing movement of her jaw. She chews on the tube that's in her trachea, going down to her lungs.

Q And you have observed also that she has had a few

attempts at spontaneous breathing?

A Yes.

Q And that's consistent with there still being some activity in the lower brain stem?

A Yes, that's right.

Report of Proceedings, at 9.

Asked as to her prognosis for recovery, Dr. Ruf answered:

I think there's no chance that she'll have any *purposeful lifestyle.* I think she could persist in a vegetative state, even with the removal of the respirator, but the chances of that are very low, also. I think at the very best she's going to be in a vegetative state.

(Italics mine.) Report of Proceedings, at 9–10.

Dr. Trenouth testified that the EEG "is not entirely flat as Dr. Ruf has testified, which shows a slight to minimal amount of activity". He testified further that Colyer "still is maintaining blood pressure and her heart is still functioning". Report of Proceedings, at 12.

Mrs. Higgerson, Colyer's sister, testified, "We feel that it's going against God's will to keep her artificially alive". Report of Proceedings, at 13. The surviving husband and Mrs. Colyer's four sisters all testified to substantially the same thing—that Bertha in her lifetime never discussed the issue of whether or not, if her physical condition should become hopeless, all artificial means should be eliminated, or what they should do if she were to have a prolonged illness which would indicate that she could not recover. However, they all stated that she hated doctors and hospitals, and even when she was very sick she wouldn't go to see a doctor. They all speculated that if she was competent she would make the decision under the present circumstances not to continue with the life supporting mechanism.

Based upon such medical and lay testimony, Philip Rosellini, guardian ad litem for Bertha Colyer, opposed the petition and filed his medical report wherein he concluded:

In the absence of death or consent, and without statutory authority or controlling precedent, the superior court may not terminate life support systems. By any definition Bertha Colyer is not dead, she is unable to give her

consent and, through her guardian ad litem, opposes the relief requested by petitioner. There is no statutory authority or controlling precedent which would permit the superior court to terminate the life support systems presently maintaining Bertha Colyer.

Clerk's Papers, at 14.

## II

In *In re Bowman,* 94 Wn.2d 407, 617 P.2d 731 (1980), we held that a person is dead if he meets either the brain death standard or the cessation of circulatory and respiratory function standard, and that it is for the medical profession to determine the applicable criteria in accordance with accepted medical standards. The *Bowman* court concluded at page 421:

We therefore adopt the provisions of the Uniform Determination of Death Act which state:
An individual who has sustained either (1) irreversible cessation of circulatory and respiratory functions, or (2) irreversible cessation of all functions of the entire brain, including the brain stem, is dead. A determination of death must be made in accordance with accepted medical standards.

Justice Utter, speaking for the Supreme Court, pointed out in *Bowman* at page 413:

The specific issue in this case is whether or not Matthew was legally dead on October 17, 1979, when the physicians declared that he had suffered brain death. We are not presented with the much more difficult question of whether life support mechanisms may be terminated while a person is still alive but in that condition known as a "persistent vegetative state," in which some brain functioning continues to exist.

Eighteen months after *Bowman,* we are faced with that precise issue. Neither the Washington State Legislature nor the appellate courts have addressed this subject previously.

The majority agrees that this is a case of first impression, and looked to five other states with supposedly similar factual situations for guidance. *See In re Quinlan,* 70 N.J. 10, 355 A.2d 647, *cert. denied,* 429 U.S. 922, 50 L. Ed. 2d 289,

97 S. Ct. 319 (1976); *Superintendent of Belchertown State Sch. v. Saikewicz,* 373 Mass. 728, 370 N.E.2d 417 (1977); *Leach v. Akron Gen. Med. Ctr.,* 68 Ohio Misc. 1, 426 N.E.2d 809 (1980); *Severns v. Wilmington Med. Ctr., Inc.,* 421 A.2d 1334 (Del. 1980); *In re Storar,* 52 N.Y.2d 363, 420 N.E.2d 64, 438 N.Y.S.2d 266 (1981). The five listed cases, however, give little support for withdrawing a life supporting mechanism in such a short time period. *Leach* allowed termination of life supporting mechanisms in 4 months; *Severns* in 5 months; the *Quinlan* case, after 1 year. The other two cases, *Saikewicz* and *Storar,* involved noncomatose individuals, both of whom were retarded. The majority opinion represents the most liberal interpretation in the United States as to the length of time an incompetent must remain on a life supporting mechanism before it can be medically determined there is no reasonable possibility of the incompetent ever emerging from the present comatose condition to a cognitive, sapient state.

Evidence presented to the trial court by the attending physicians has shown that Bertha Colyer was indeed alive, and a finding was made by the trial court to that effect. There do exist documented medical instances when fact patterns similar to the one at bar were present and the patient ultimately survived, although these cases are rare. A judge of our own Washington state judicial system a year ago sustained a cardiac arrest. Today he is back on the job full time with no depreciation of his mental abilities, and without any physical restrictions. Time is a great healer.[10]

My strongest objection to the granting of this petition is that so little time transpired—only 25 days from the time

---

[10]There exists the case of Dr. Lev Landau, 1962 Nobel prize winner in physics. Dr. Landau suffered severe brain damage as the result of a motor vehicle accident. There existed no response to external stimuli, he had no reflexes and was maintained upon a respirator for 7 weeks. During the time he was on the respirator his heart failed four times and he had a "flat EEG" for 100 days. However, he survived and resumed his studies in theoretical physics. Currie, "The Redefinition of Death", in *Organism, Medicine and Metaphysics,* 177–97 (S. Spiker ed. 1978).

of the cardiac arrest until the Supreme Court order autho-
rizing implementation of the Superior Court order termi-
nating the life supporting mechanism keeping Bertha
Colyer alive. Only 16 days transpired between the time of
the cardiac arrest until the two attending physicians testi-
fied. This time period is shockingly short. Here was a per-
son whose brain stem was still functioning as the control
box for the other parts of the brain. The majority concedes
she had some reflexes and some EEG brain activity. It is
possible Colyer might have returned to a very useful life,
although physically restricted in some manner.

### III

Bertha Colyer is now gone, and little would be gained by
discussing the past. As to the future, however, I do not
support the majority's suggested plan for disposing of simi-
lar cases. I strongly disagree with the majority's statement
at page 134 that an administrative body composed of phy-
sicians, social workers, attorneys and theologians "does not
best serve the desired function" of properly deciding when
the patient's right of privacy outweighs the State's interest
in preserving life.

An ethics committee composed of a variety of people
concerned about the welfare of the comatose patient would
allow the responsibility of the judgment to be diffused,
lightening somewhat the heavy burden which would be
placed upon the attending and associate physicians under
the majority's recommendation. *In re Quinlan,* at 49–50.
Additionally, such a committee would protect the hospital
in screening out those cases where the family or physician
might be motivated by less than worthy considerations. As
the *Quinlan* court noted at page 50, "In the real world and
in relationship to the momentous decision contemplated,
the value of additional views and diverse knowledge is
apparent".

Where the patient is on a life supporting mechanism
such as a respirator, is not legally dead, and has not previ-
ously requested termination under those conditions, I

would require a waiting period of at least 120 days before a prognosis of the patient's future is attempted. At that time, the matter should be referred to the ethics committee of the hospital. If such ethics committee does not exist, a committee composed of physicians, social workers, attorneys and theologians should be appointed.[11] If this committee then unanimously concludes it would be in the patient's best interest to terminate the patient's life supporting mechanism, no further decision by a court would be necessary. If the committee is divided as to the wisdom of terminating the mechanism, however, the matter should be presented to superior court for final determination. At that stage, the court shall appoint a guardian ad litem to represent the interests of the patient.

In the present case, I would have continued the injunction, pending a 120–day waiting period and the recommendation of an extended ethics committee such as that described in the *Quinlan* case.

ROSELLINI, J., concurs with DORE, J.

[11]I would suggest the Washington State Medical Association establish such a standing committee for the benefit of those hospitals and medical facilities not having their own ethics committees. The benefit of the knowledge of the members of this committee would then be available on a statewide basis.