# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>  Respondent,<br><br>  v.<br><br>MELISSA CATHRYN MCMILLEN,<br><br>  Appellant. | No. 45586-2-II<br><br>consolidated with |
| In re the Personal Restraint Petition of:<br><br>MELISSA CATHRYN MCMILLEN,<br><br>  Petitioner. | No. 47503-1-II<br><br>UNPUBLISHED OPINION |

MELNICK, J. — Melissa McMillen appeals her conviction for felony murder in the second degree following a bench trial. McMillen's related personal restraint petition (PRP) is consolidated with her direct appeal. We conclude that sufficient evidence supports McMillen's conviction; McMillen did not receive ineffective assistance of counsel; the trial court did not abuse its discretion when it admitted expert witness testimony; and McMillen's rights to privacy and equal protection were not violated. [1]

---

[1] We permitted an amicus curiae brief to be filed by the National Advocates for Pregnant Women, the American Civil Liberties Union of Washington, Legal Voice, and the Birth Rights Bar Association in support of McMillen. The amici raised two issues that we have already addressed in our analysis, sufficiency of the evidence and McMillen's right to privacy. Amici also presented two new arguments that were not raised by McMillen. We do not address them. We may, but usually do not, reach arguments raised only by amicus. *State v. Duncan*, No. 90188-1 (Wash. Apr. 28, 2016); *Madison v. State*, 161 Wn.2d 85, 104 n.10, 163 P.3d 757 (2007).

We affirm McMillen's conviction and deny her PRP.

FACTS

I.    THE CRIME

In June 2011, while alone in the basement of her residence, McMillen gave birth to a full-term baby girl.  She birthed the baby while sitting on a toilet.  McMillen left the purple-looking baby in the toilet for approximately 90 minutes while she took a shower and cleaned up the surrounding area.  McMillen then wrapped the baby in a towel, placed her in a plastic garbage bag, and put her into a bag she used for school.  McMillen placed the bag behind a board in the basement, where it remained until law enforcement found it three days later.  The morning of the birth, McMillen told her boyfriend, Zachary Beale, that the baby was stillborn.

II.    DEFENDANT'S INTERVIEW AND CHARGE

Detective Daniel Davis interviewed McMillen after law enforcement found the baby.  McMillen seemed "pretty calm" and "maybe a little detached from the gravity of the situation" during the interview.  5 Report of Proceedings (RP) at 387.  McMillen said that she took a shower after giving birth, and then used bleach to clean up.  She said that after she cleaned up, she "'wasn't quite sure on what to do with [the baby], and it was still wrapped up in a towel, so [she] just put the towel into a garbage bag, . . . and then from that [she] had put the bag into an old school book bag.'"  5 RP at 418-19.  The placenta and umbilical cord were "'wrapped up in the towel together'" with the baby.  5 RP at 421.

The State charged McMillen with murder in the second degree which occurred while committing or attempting to commit the crime of criminal mistreatment in the first or second degree, or abandonment of a dependent person in the first or second degree.  The State also alleged

2

two aggravating factors: that the baby was particularly vulnerable or incapable of resistance and that the offense manifested deliberate cruelty or intimidation of the victim.

III.     MEDICAL TESTIMONY

A.     MCMILLEN EXAMINATION – DR. CHRISTINA HITCHCOCK

The day after law enforcement discovered the baby, Hitchcock, a board certified OB/GYN (obstetrician/gynecologist), examined McMillen.  As part of the exam, McMillen told Hitchcock that the baby was stillborn.  She described the birth to Hitchcock.  She said she delivered the baby while sitting on a toilet.  McMillen told Hitchcock that after she delivered, the "baby looked purple."  6 RP at 475.  She left the baby in the toilet for about 90 minutes while she took a shower.

McMillen described her bleeding after the birth as red blood, which Hitchcock opined is "very typical after a delivery."  6 RP at 460.  McMillen "denied that it was dark brown or any other color in nature."  6 RP at 460.  Hitchcock testified that when a complication occurs during pregnancy and the placenta is torn away from the wall of the uterus, blood can build up and will "come out as old, brown blood."  6 RP at 460.  If the entire placenta becomes separated from the uterus and the baby does not get blood flow, it can result in a stillbirth.  If the placenta is completely detached, it comes "flying out with the baby" during birth.  6 RP at 461.  McMillen told Hitchcock that the placenta took some time to come out after she birthed the baby.  McMillen denied that the umbilical cord was wrapped around the baby.

Hitchcock conducted a fetal blood screen on McMillen.  The result of the test indicated McMillen's system contained no blood from the baby.  Hitchcock tested McMillen for clotting disorders as she "would with anyone that would have had a stillbirth," and all were normal.  6 RP at 462.  As she would after any type of miscarriage or delivery that may involve bleeding issues,

Hitchcock performed an ultrasound on McMillen. The ultrasound did not reveal that any membrane or tissues were still attached to the uterus.

B.      AUTOPSY – DR. THOMAS CLARK

Clark, the Pierce County Medical Examiner, performed an autopsy on the baby after being briefed on the investigation by Davis. Clark described the baby as a full-term female with no apparent congenital defect. The baby's lungs were aerated and fully expanded. Clark found air in the initial portion of the gastrointestinal (GI) tract, stomach, and duodenum.[2]

Clark explained the importance of these findings. As babies take their first breaths, their lungs inflate. They also swallow air, which gets pushed through their bodies to the bowel. The baby's lungs were not aerated as a result of decomposition. He opined that the baby "took enough breaths to completely open up the lungs." 6 RP at 498. By x-ray, the baby's lungs appeared uniformly and completely expanded, making it unlikely that any air was present in the lungs due to manipulation, compression, or motion.

The baby had "a large hematoma, which is a collection of blood and blood clot in between the scalp and the skull." 6 RP at 501. He opined that "[t]his blood could not have been [t]here if this infant was dead in the uterus." 6 RP at 502. He could not exclude the possibility of the injury occurring from trauma, "but it is more likely the result of gravity." 6 RP 506. The baby also had a subdural hematoma, which is "a collection of blood in the subdural space." 6 RP at 507. It could have been caused at the same time as the hemorrhage on the outside of the skull or during birth. Clark opined that the baby had a blood pressure when the hematoma occurred.

---

[2] "Duodenum is the first part of the small bowel, but connects the stomach to the rest of the intestines." 6 RP at 497.

Clark also testified that he took sections from each of the baby's lungs and they floated in liquid, indicating that the lungs had been aerated. "Typically lung tissue does not float in a stillborn that never breathed." 6 RP at 515. He opined that a baby who died in utero would not have expanded lungs and that no air would be in the GI tract. The placenta was not exposed to bacteria while it was still in the body. Clark explained that this finding was significant because "an infection that proceeds up through the vagina and into the uterus before birth can cause . . . an infection of the membranes surrounding the fetus, and that can cause the fetus to abort. That was not present." 6 RP at 523. The placenta had a normal amount of blood, indicating the placenta did not abrupt from the uterus. Clark also opined that "the umbilical cord was likely cut." 6 RP at 525.

Clark opined that the baby was "born alive, based on the aerated lungs, air in the stomach, and the large scalp hematoma." 6 RP at 526. The cause of death was not clear, but "[g]iven the circumstances, the death [was] much [more] likely due to a combination of drowning and hypothermia. It's also likely that blood loss occurred through the umbilical cord and into the scalp, further contributing to the conditions that caused this [baby]'s death." 6 RP at 526-27.

Clark admitted that "the cause of death really is circumstantial based on the fact that [he] kn[e]w the baby was born alive" and the cause of death was a "logical conclusion." 6 RP at 538. "There is nothing in the autopsy to support drowning or hypothermia as a cause of death." 6 RP at 538. Although he could not completely exclude the possibility that the baby had a metabolic disease,[3] he did adequately rule out abruption of the placenta.

---

[3] Metabolic disease refers to birth defects and diseases that would not have been seen.

C.    FORENSIC PATHOLOGIST – DR. CLIFFORD NELSON

Nelson, a forensic pathologist and deputy state medical examiner for Oregon, rebutted some of Clark's opinions. Nelson stated that the only way to make a positive determination of a live birth is if the baby had food in her stomach or an injury that could only have occurred after birth. Nelson reviewed the records and found no proof that the baby died in utero or that the baby was born alive. He explained that air or gas in the lungs was not proof of a live birth because handling a body post-mortem can cause air to get into the lungs and stomach. He opined that the post-mortem handling of the baby in this case could account for what appeared on x-rays to be air in her stomach and lungs. But when he looked at the x-rays, he could not know for sure whether the air was introduced by handling or breathing. He also opined that the gas in the baby's lungs was primarily due to decomposition. Nelson opined that the baby's head injury occurred during birth. Nelson could not give an opinion on whether the baby was stillborn or born alive.

D.    MEDICAL DIRECTOR, CHILD ABUSE INTERVENTION DEPARTMENT – DR. YOLANDA DURALDE

Duralde, medical director at the Child Abuse Intervention Department at Mary Bridge Hospital, testified in the State's rebuttal case regarding the baby's head injury. Duralde worked as director of the Child Abuse Intervention Department for over 20 years, and has delivered babies. She not only saw patients involving allegations of physical abuse, but also consulted on cases involving concerns of abuse. She examined babies with head trauma at least four or five times a year. Duralde also educated other physicians on injuries to babies.

Duralde testified in this case about the baby's head injury and other pediatric injuries. McMillen objected to the testimony on the bases that Duralde did not have the required expertise to give an opinion and because she had not performed the autopsy. The court overruled the objection.

Duralde opined that the baby's head injury occurred post-delivery and most likely occurred when the baby hit her head on the toilet. She reached this opinion based on autopsy photos of the baby's head and the circumstances of the birth. In Duralde's opinion, the injury did not happen in the birth canal because "there was not any description of a difficult labor or a lot of pushing or anything that would indicate difficulty in this [baby] coming through the birth canal." 9 RP at 797.

IV.     VERDICT AND POST TRIAL MOTION

McMillen waived her right to a jury trial and the matter proceeded to a bench trial. At the conclusion of the trial, the trial court entered findings of fact and conclusions of law. The trial court found that McMillen committed abandonment in the second degree. The trial court found that as a result of recklessly abandoning the baby, McMillen caused the baby's death. Therefore, the trial court found McMillen guilty of felony murder in the second degree. The trial court did not find that McMillen acted with deliberate cruelty, but did find that that the baby's vulnerability was a substantial factor in the commission of the crime.

McMillen moved for a mistrial after the trial court announced the verdict, claiming that trial counsel provided ineffective assistance due to personal issues. McMillen's trial counsel informed the trial court that two weeks before the trial her husband received a diagnosis of terminal cancer, and that she was distracted and should have done things differently.[4] The trial court denied McMillen's motion for a mistrial.

V.      SENTENCING

McMillen requested a sentence below the standard range. She argued for the first time that she suffered from neonaticide syndrome, and it was a substantial and compelling reason to

---

[4] The State noted that it had offered "additional time" to complete the trial to allow counsel to be prepared. RP (Sept. 5, 2013) at 11.

7

distinguish McMillen's crime from other murder in the second degree cases. The trial court sentenced McMillen to 123 months of confinement, the low end of the standard range. McMillen appeals.

ANALYSIS

I.    SUFFICIENT EVIDENCE

McMillen argues that insufficient evidence supported both the predicate offense of abandonment in the second degree and the felony murder in the second degree charge. We disagree.

A.    STANDARD OF REVIEW

To determine whether sufficient evidence supports a conviction, we view the evidence in the light most favorable to the State and determine whether any rational fact finder could have found the elements of the crime beyond a reasonable doubt. *State v. Engel*, 166 Wn.2d 572, 576, 210 P.3d 1007 (2009). "In claiming insufficient evidence, the defendant necessarily admits the truth of the State's evidence and all reasonable inferences that can be drawn from it." *State v. Drum*, 168 Wn.2d 23, 35, 225 P.3d 237 (2010).

Following a bench trial, our review is limited to determining whether substantial evidence supports the findings of fact, and if so, whether the findings support the conclusions of law. *State v. Homan*, 181 Wn.2d 102, 105-06, 330 P.3d 182 (2014). We may look to the trial court's oral findings to aid its review if the written findings are incomplete. *State v. Manion*, 173 Wn. App. 610, 633, 295 P.3d 270 (2013), *review denied*, 180 Wn.2d 1027 (2014). We may consider a trial court's oral decision so long as it is not inconsistent with the trial court's written findings and conclusions. *State v. Kull*, 155 Wn.2d 80, 88, 118 P.3d 307 (2005).

8

"'Substantial evidence' is evidence sufficient to persuade a fair-minded person of the truth of the asserted premise." *Homan*, 181 Wn.2d at 106. Unchallenged findings of fact are verities on appeal. *Homan*, 181 Wn.2d at 106. We review challenges to a trial court's conclusions of law de novo. *State v. Gatewood*, 163 Wn.2d 534, 539, 182 P.3d 426 (2008).

B.      SUFFICIENT EVIDENCE SUPPORTS MCMILLEN'S CONVICTION

1.      Abandonment in the Second Degree

McMillen first argues that the predicate offense of abandonment in the second degree is unsupported by sufficient evidence. We disagree.

RCW 9A.42.070 provides that

(1) . . . [A] person is guilty of the crime of abandonment of a dependent person in the second degree if:
    (a) The person is the parent of a child, a person entrusted with the physical custody of a child or other dependent person, a person who has assumed the responsibility to provide to a dependent person the basic necessities of life, or a person employed to provide to the child or other dependent person any of the basic necessities of life; and
    (b) The person recklessly abandons the child or other dependent person; and:
    . . . .
        (ii) Abandoning the child or other dependent person creates an imminent and substantial risk that the child or other dependent person will die or suffer great bodily harm.

Thus, to convict McMillen of abandonment in the second degree, the State had to prove that McMillen, the parent, recklessly abandoned her baby and created an imminent and substantial risk that the baby would die or suffer great bodily harm.

Here, sufficient evidence supports McMillen's conviction for abandonment in the second degree. McMillen was the biological mother of the baby. Hitchcock testified that McMillen said the "baby looked purple" after she gave birth, but she "just kind of left it there." 6 RP at 475. Nelson testified that the baby had "a large hematoma, which is a collection of blood and blood clot

9

in between the scalp and the skull." 6 RP at 501. He opined that "[t]his blood could not have been [t]here if this infant was dead in the uterus." 6 RP at 502. McMillen left the baby in the toilet for approximately 90 minutes. McMillen did not provide the baby with the basic necessities of life. She wrapped the baby in a towel and a bag. She then secreted the baby in a wall.[5] Clark opined that the baby was "born alive, based on the aerated lungs, air in the stomach, and the large scalp hematoma." 6 RP at 526. The cause of death was not clear, but "[g]iven the circumstances, the death is much likely due to a combination of drowning and hypothermia. It's also likely that blood loss occurred through the umbilical cord and into the scalp, further contributing to the conditions that caused this [baby]'s death." 6 RP at 526-27. These actions circumstantially and directly demonstrate abandonment.

Viewing this evidence in the light most favorable to the State, a rational fact finder could find beyond a reasonable doubt that McMillen abandoned her baby and thereby caused the death of the baby. Therefore, substantial evidence supports the trial court's conclusion that McMillen committed abandonment in the second degree.

> 2. Felony Murder in the Second Degree

Having concluded that sufficient evidence supports the predicate offense of abandonment in the second degree, we next consider whether substantial evidence supports the charge of murder in the second degree. RCW 9A.32.050 provides that

> (1) A person is guilty of murder in the second degree when:
> . . . .
> (b) He or she commits or attempts to commit any felony, including assault, other than those enumerated in RCW 9A.32.030(1)(c), and, in the course of and in furtherance of such crime or in immediate flight therefrom, he or she, or another participant, causes the death of a person other than one of the participants.

---

[5] McMillen seems to argue that she was prosecuted because she did not seek medical assistance for the baby. However, the trial court specifically found that she abandoned the baby.

Thus, to convict McMillen of felony murder in the second degree, the State had to prove that the baby died in the commission of the abandonment.

Clark testified that the baby's lungs were bilaterally aerated, evidencing that the baby took a breath. The amount of bleeding associated with the baby's head injury "could not have been [t]here if th[e] infant was dead in the uterus," and the injury is a result of post-partum trauma. 6 RP at 502. Clark testified that the baby did not die in the birth canal. He also ruled out McMillen having had a placental abruption and testified that a placental abruption did not contribute to the baby's death. There was no evidence of any metabolic or toxicology abnormality in the baby. Clark opined that although the cause of the baby's death was not clear, the logical conclusion was that death likely occurred due to a combination of drowning and hypothermia.

Viewing this evidence in the light most favorable to the State, a rational fact-finder could have found beyond a reasonable doubt that the baby was born alive and died in the commission of abandonment when McMillen left the baby in the toilet for 90 minutes. Therefore, substantial evidence supports the trial court's conclusion that McMillen committed felony murder in the second degree.

II.    INEFFECTIVE ASSISTANCE OF COUNSEL

McMillen argues that she received ineffective assistance of counsel because her trial counsel did not object based on the corpus delicti rule, did not present evidence that McMillen suffered from neonaticide syndrome, did not introduce testimony from a mental health manager at the jail, and had personal problems which led to a lack of preparation. We disagree.

A.    STANDARD OF REVIEW

A defendant claiming ineffective assistance of counsel has the burden to establish that (1) counsel's performance was deficient and (2) the performance prejudiced the defendant's case. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Failure to establish either prong is fatal to an ineffective assistance of counsel claim. *Strickland*, 466 U.S. at 700. An attorney's performance is deficient if it falls "below an objective standard of reasonableness based on consideration of all the circumstances." *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). Deficient performance prejudices a defendant if there is a "reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different." *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009).

Our scrutiny of counsel's performance is highly deferential; we strongly presume reasonableness. *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011). To rebut this presumption, a defendant bears the burden of establishing the absence of any legitimate trial tactic explaining counsel's performance. *Grier*, 171 Wn.2d at 33. Ineffective assistance of counsel is a mixed question of law and fact that we review de novo. *In re Pers. Restraint of Fleming*, 142 Wn.2d 853, 865, 16 P.3d 610 (2001).

B.    MCMILLEN DID NOT RECEIVE INEFFECTIVE ASSISTANCE OF COUNSEL

1.    Corpus Delicti

McMillen first argues that her trial counsel's performance was deficient because her attorney did not challenge the sufficiency of the corroborating independent evidence under the

corpus delicti rule. Trial counsel's failure to move to suppress evidence does not support an ineffective assistance of counsel claim unless it can be shown that the motion would properly have been granted. *State v. Price*, 127 Wn. App. 193, 203, 110 P.3d 1171 (2005), *aff'd*, 158 Wn.2d 630, 146 P.3d 1183 (2006). Because McMillen cannot show that a corpus delicti challenge would have succeeded, she cannot demonstrate that she received ineffective assistance of counsel.

"A defendant's incriminating statement alone is not sufficient to establish that a crime took place." *State v. Brockob*, 159 Wn.2d 311, 328, 150 P.3d 59 (2006) (footnote omitted). The State must present independent evidence to corroborate that the crime described in the defendant's incriminating statement took place. *Brockob*, 159 Wn.2d at 328.

The corpus delicti rule "tests the sufficiency or adequacy of evidence," independent of the defendant's confession, to corroborate a defendant's incriminating statement. *State v. Dow*, 168 Wn.2d 243, 249, 227 P.3d 1278 (2010). The State must present sufficient independent corroborating evidence of the defendant's confession to support the inference that the crime with which the defendant has been charged has occurred. *Brockob*, 159 Wn.2d at 329. The "independent evidence 'must be consistent with guilt and inconsistent with a[ ] hypothesis of innocence.'" *Brockob*, 159 Wn.2d at 329 (quoting *State v. Aten*, 130 Wn.2d 640, 660, 927 P.2d 210 (1996)). The corpus delicti in a homicide case consists of two parts: first, that a death occurred and second, a causal connection between the death and a criminal act. *Aten*, 130 Wn.2d at 655. The corpus delicti can be proved by either direct or circumstantial evidence. *Aten*, 130 Wn.2d at 655.

"The independent evidence need not be sufficient to support a conviction, but it must provide prima facie corroboration *of the crime described in the defendant's incriminating statement*." *Brockob*, 159 Wn.2d at 328. "Prima facie corroboration of a defendant's incriminating statement exists if the independent evidence supports a 'logical and reasonable inference of the facts sought to be proved.'" *Brockob*, 159 Wn.2d at 328 (quoting *Aten*, 130 Wn.2d at 656) (internal quotation marks omitted). We view all reasonable inferences in the light most favorable to the State and assume the truth of the State's evidence. *Aten*, 130 Wn.2d at 658.

Here, a motion to exclude McMillen's admissions based on corpus delicti would have failed because the State's independent evidence established that a death occurred and that it occurred by a criminal act. The evidence demonstrates that the baby was born alive and later died. The evidence also showed that the death occurred because of a criminal act, i.e. during the commission of abandonment.

The corroborating evidence to McMillen's statements showed that the baby had a head wound consistent with blunt force trauma that occurred after birth. The State presented extensive evidence that McMillen's baby was born alive and later died. Clark opined that blood loss resulting from the baby's head injury and through the umbilical cord also likely contributed to death. Law enforcement discovered the baby wrapped in a garbage bag, placed inside a bag, and then hidden behind a board in the basement. Viewing this evidence in the light most favorable to the State, the State presented sufficient evidence independent of McMillen's statements to establish the corpus delicti of murder in the second degree. Therefore, trial counsel's performance

14

was not deficient for failing to make a corpus delicti motion because it would not have been granted.[6] McMillen's claim fails.

2.    Neonaticide Syndrome

McMillen next argues that that her counsel's performance was deficient because she did not present evidence that McMillen suffered from neonaticide syndrome. Because the evidence would not have been admissible, her trial counsel's performance was not deficient.

"Neonaticide is the murder of a baby within the first twenty-four hours of life." Amy D. Wills, *Neonaticide: The Necessity of Syndrome Evidence When Safe Haven Legislation Falls Short*, 77 Temp. L. Rev. 1001 (2004). Neonaticide syndrome has not been discussed in Washington case law, but secondary sources provide insight into the syndrome. Many women who commit neonaticide suffer from similar personality traits and behavior patterns during pregnancy and labor. Wills at 1011-12. Many women suffering from neonaticide deny pregnancy, go through labor alone, and conceal the child. Wills at 1012.

---

[6] McMillen argues this case is analogous to *State v. Pineda*, 99 Wn. App. 65, 992 P.2d 525 (2000). In that case, the forensic pathologist who performed the autopsy on of a nine-day-old baby testified that he relied on the defendant's statements that she possibly suffocated the baby to exclude Sudden Infant Death Syndrome (SIDS) as a cause of death. *Pineda*, 99 Wn. App. at 73-74. The forensic pathologist found some evidence that occurs in "'80 to 85 percent'" of SIDS cases. *Pineda*, 99 Wn. App. at 73. He excluded SIDS as a possible cause of death only because he received information that the defendant admitted to suffocating the baby. *Pineda*, 99 Wn. App. at 73. Without that information, his "diagnosis would have been a probable Sudden Infant Death Syndrome." *Pineda*, 99 Wn. App. at 73.

But this case is distinguishable. Here, although Clark relied on information he received from law enforcement that McMillen left the baby in a toilet for 90 minutes to determine that the baby most likely died of a combination of drowning and hypothermia, he also relied on information besides McMillen's statements to make his determination as to cause of death. He testified that the scalp hematoma was large and that resulting blood loss could be significant. Blood loss through the umbilical cord also could have been significant enough to cause the death. Clark provided no testimony that he would have excluded any particular cause of death but for McMillen's statements.

15

> [S]ome researchers believe that women suffering from neonaticide syndrome panic when faced with an infant resulting from a pregnancy they have denied for nine months. In many cases these young mothers do not even recognize the newly born infant as a child, but instead see the infant as an object. This absence of an emotional bond between the mother and her infant may account for some of the chillingly callous and bizarre behavior of mothers who commit neonaticide.

Wills at 1012 (footnotes omitted).

Neonaticide syndrome is not a recognized defense in Washington. A nationwide search returned no cases in which neonaticide syndrome was presented as a mental health defense. McMillen fails to establish that evidence of neonaticide syndrome would have been admissible at trial.

Additionally, McMillen fails to meet her burden of establishing the absence of any conceivable legitimate trial tactic explaining counsel's performance. McMillen defended the case on a theory that the baby was not born alive. Her expert's testimony revolved around the difficulty in conclusively determining whether or not the baby was born alive and later died. Presenting evidence of neonaticide syndrome would have undermined the theory that the baby was not born alive, or that McMillen believed the baby was stillborn. A choice of not presenting mutually exclusive conflicting defenses by trial counsel is a matter of strategy. Therefore, trial counsel's performance was not deficient, and McMillen's claim fails.

### 3. Decision Not to Call Witness

McMillen next seems to argue that her trial counsel's performance was deficient because she did not introduce testimony from Judy Snow, a mental health manager at the jail who had interviewed McMillen. In general, the decision of whether to call a specific witness is presumed to be a matter of legitimate trial tactics. *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 742, 101 P.3d 1 (2004). This presumption can be overcome by showing that counsel failed to investigate

the available defenses, adequately prepare for trial, or subpoena necessary witnesses. *Davis*, 152 Wn.2d at 742.

Here, the record demonstrates that Snow would have testified regarding McMillen's demeanor two weeks after she delivered the baby. Snow noted that McMillen's demeanor seemed inappropriate for someone who had just given birth and then been arrested. Using this testimony may have undermined defense's theory of the case that the baby was a stillborn, and may have been damaging to McMillen. McMillen fails to establish the absence of any conceivable legitimate trial tactic explaining trial counsel's decision not to introduce Snow's testimony. Therefore, trial counsel's performance was not deficient.

### 4. Effective Advocacy

Finally, McMillen argues that her trial counsel's personal problems and failure to prepare prevented her from providing effective advocacy throughout trial. She argues several specific instances of alleged deficient performance, including failure to adequately prepare for cross-examination of the State's expert and failure to property utilize an electronic presentation. Even assuming that trial counsel's performance was deficient, McMillen fails to demonstrate that it caused her prejudice. To demonstrate prejudice, she must show a reasonable probability that the outcome of the case would have been different but for counsel's error. *Kyllo*, 166 Wn.2d at 862. This probability must be sufficient to undermine confidence in the outcome.

Here, McMillen provides no indication of such a probability. The State's evidence was so strong that there is no reasonable probability that the fact finder would have failed to find McMillen guilty of murder in the second degree but for trial counsel's deficiencies. *Kyllo*, 166 Wn.2d at 862. McMillen told Hitchcock that she left the baby in the toilet for 90 minutes. She wrapped the baby in a towel and a bag, and then secreted her in a wall. The State presented extensive evidence that

17

the baby was born alive and later died. Because McMillen cannot show a reasonable probability that the outcome of her case would have been different, we hold that her ineffective assistance of counsel claim fails.

III.    EXPERT TESTIMONY

McMillen argues that the trial court abused its discretion when it admitted Duralde's testimony because she was not qualified and her testimony was not helpful to the trier of fact. We disagree.

A.    STANDARD OF REVIEW

ER 702 generally governs the admissibility of expert testimony. *Anderson v. Akzo Nobel Coatings, Inc.*, 172 Wn.2d 593, 600, 260 P.3d 857 (2011). ER 702 provides that testimony based on "scientific, technical, or other specialized knowledge" is admissible if the trial court determines that it "will assist the trier of fact to understand the evidence or to determine a fact in issue." *Anderson*, 172 Wn.2d at 600 n.1. Accordingly, expert testimony usually is admissible under ER 702 if it will be "helpful to the jury in understanding matters outside the competence of ordinary lay persons." *Anderson*, 172 Wn.2d at 600.

Trial courts have broad discretion to determine the circumstances under which expert testimony will be allowed. *Johnston-Forbes v. Matsunaga*, 181 Wn.2d 346, 354, 333 P.3d 388 (2014). Accordingly, we review the trial court's decision whether to admit expert testimony under ER 702 for an abuse of discretion. *State v. Green*, 182 Wn. App. 133, 146, 328 P.3d 988, *review denied*, 181 Wn.2d 1019 (2014). We "will not disturb the trial court's ruling '[i]f the reasons for admitting or excluding the opinion evidence are both fairly debatable . . . .'" *Miller v. Likins*, 109 Wn. App. 140, 147, 34 P.3d 835 (2001) (quoting *Davidson v. Municipality of Metro. Seattle*, 43 Wn. App. 569, 572, 719 P.2d 569 (1986)). And even where the helpfulness of expert testimony is

doubtful, courts favor admissibility. *State v. King County Dist. Court W. Div.*, 175 Wn. App. 630, 638, 307 P.3d 765 (2013).

Determining the admissibility of expert testimony depends on the specific facts of each case. *Johnston-Forbes*, 181 Wn.2d at 354. "The broad standard of abuse of discretion means that courts can reasonably reach different conclusions about whether, and to what extent, an expert's testimony will be helpful to the jury in a particular case." *Stedman v. Cooper*, 172 Wn. App. 9, 18, 292 P.3d 764 (2012).

### B.    THE TRIAL COURT DID NOT ABUSE ITS DISCRETION

The trial court did not abuse its discretion when it found Duralde qualified to testify based on her training and experience. Duralde is a medical doctor and had been the medical director at the Child Abuse Intervention Department at Mary Bridge Hospital for over 20 years. Although she did not deliver babies in her current practice, she had a background in family medicine and delivered babies in the past. She examined babies with head trauma at least four to five times per year, and also educated other physicians regarding injuries to babies. The trial court limited her testimony to the baby's head injury and pediatric injuries generally. The trial court did not abuse its discretion in finding Duralde had the necessary qualifications to testify on the subject matter.

Next, the trial did not abuse its discretion by concluding that Duralde's testimony was relevant and helpful to the finder of fact. In this case, Duralde's testimony helped the finder of fact understand the nature of the baby's head injury and whether it occurred during or after birth. She opined that the baby's head injury occurred post-delivery and most likely occurred when the baby hit her head on the toilet. She reached this opinion based on autopsy photos of the baby's head and the circumstances of the birth. In Duralde's opinion, the injury did not happen in the birth canal because "there was not any description of a difficult labor or a lot of pushing or anything

19

that would indicate difficulty in this [baby] coming through the birth canal." 9 RP at 797. This evidence was clearly relevant and helpful. In addition, the finder of fact determined the weight to give Duralde's testimony. The trial court did not abuse its discretion in admitting Duralde's testimony.

## PERSONAL RESTRAINT PETITION

### I. STANDARD OF REVIEW

A petitioner may request relief through a PRP when she is under an unlawful restraint. RAP 16.4(a)-(c). "A personal restraint petitioner must prove either a (1) constitutional error that results in actual and substantial prejudice or (2) nonconstitutional error that 'constitutes a fundamental defect which inherently results in a complete miscarriage of justice.'" *In re Pers. Restraint of Monschke*, 160 Wn. App. 479, 488, 251 P.3d 884 (2010) (quoting *Davis*, 152 Wn.2d at 672 (internal quotation omitted)). The petitioner must prove the error by a preponderance of the evidence. *In re Pers. Restraint of Lord*, 152 Wn.2d 182, 188, 94 P.3d 952 (2004). In addition, "[t]he petitioner must support the petition with facts or evidence and may not rely solely on conclusory allegations." *Monschke*, 160 Wn. App. at 488; RAP 16.7(a)(2)(i).

In PRPs, we ordinarily will not review issues previously raised and resolved on direct review. *In re Pers. Restraint of Gentry*, 137 Wn.2d 378, 388, 972 P.2d 1250 (1999). A PRP is not a substitute for an appeal. *In re Pers. Restraint of Hagler*, 97 Wn.2d 818, 823-24, 650 P.2d 1103 (1982).

### II. SUFFICIENT EVIDENCE

McMillen argues that the State presented insufficient evidence to convict her of abandonment because there was no evidence that the injuries suffered by the baby in childbirth were survivable. We disagree. In McMillen's direct appeal, we concluded that sufficient evidence

20

existed to support both the finding of abandonment and the conviction for murder in the second degree. The same analysis applies to her sufficiency argument presented in her PRP.[7]

III.     RIGHT TO PRIVACY AND EQUAL PROTECTION

McMillen argues that being held criminally liable for her failure to call for medical assistance for the baby after an unexpected home delivery is a violation of her personal rights to privacy and equal protection. We disagree.

A.     RIGHT TO PRIVACY

"The United States Supreme Court has identified a right of privacy emanating from the penumbra of the specific guarantees of the Bill of Rights and from the language of the First, Fourth, Fifth, Ninth and Fourteenth Amendments." *In re Welfare of Colyer*, 99 Wn.2d 114, 119, 660 P.2d 738 (1983), *holding modified by In re Guardianship of Hamlin*, 102 Wn.2d 810, 689 P.2d 1372 (1984). The United States Supreme Court has also determined that the right to privacy is a personal right, including a woman's decision on whether or not to terminate her pregnancy, and a person's freedom to care for one's own health and person or refuse medical treatment. *Colyer*, 99 Wn.2d at 119-20.

---

[7] McMillen challenges the trial court's conclusion that her actions were the proximate cause of the infant's death. McMillen argues that because she believed the baby to be dead, she did not have a duty to provide medical aid for the baby. She claims, without citation to authority, that a parental duty to seek medical aid for their "living children" only "begins when the parents are aware that medical aid is needed for the child." Br. of Petitioner at 14. Accordingly, she argues, the trial court erred in concluding that she recklessly disregarded this duty because recklessness requires that the actor know of and disregard a substantial risk that a wrongful act would occur. As stated in McMillen's direct appeal, we concluded that sufficient evidence existed of abandonment, which includes that her actions were the proximate cause of the baby's death.

Washington's Supreme Court has acknowledged that the "'decision by the incurably ill to forego medical treatment and allow the natural processes of death to follow their inevitable course is so manifestly a "fundamental" decision in their lives, that it is virtually inconceivable that the right of privacy would *not* apply to it.'" *Colyer*, 99 Wn.2d at 120 (quoting *In re Eichner*, 426 N.Y.S.2d 517, 73 A.D.2d 431, 459 (1980)).

The right to refuse treatment is not absolute, for the state has an interest in protecting the sanctity of the lives of its citizens. *Colyer*, 99 Wn.2d at 122. "This state interest has been identified in four areas: (1) the preservation of life; (2) the protection of interests of innocent third parties; (3) the prevention of suicide; and (4) maintenance of the ethical integrity of the medical profession." *Colyer*, 99 Wn.2d at 122.

McMillen argues that her right to refuse medical treatment extends to refusing medical treatment for her born-alive baby, but her argument includes citations to authority that do not accurately characterize the current law on this issue. McMillen's argument fails.

In *Prince v. Massachusetts*, 321 U.S. 158, 166-67, 64 S. Ct. 438, 442, 88 L. Ed. 645, *reh'g denied*, 321 U.S. 804, 64 S. Ct. 784, 88 L. Ed. 1090 (1944), the Court addressed whether, for religious reasons, a parent can refuse treatment for a child. The Court stated, "The right to practice religion freely does not include liberty to expose . . . the child to . . . ill health or death." *Prince*, 321 U.S. at 167. The Court further reasoned, "Parents may be free to become martyrs themselves. But it does not follow they are free, in identical circumstances, to make martyrs of their children before they have reached the age of full and legal discretion when they can make that choice for themselves." *Prince*, 321 U.S. at 170; *State v. Norman*, 61 Wn. App. 16, 23, 808 P.2d 1159 (1991). For religious reasons, a parent may refuse medical treatment on behalf of a child in some circumstances, *Prince*, 321 U.S. at 170, but these circumstances are distinct from McMillen's case.

"Parental duty to provide medical care for a dependent minor child was recognized at common law and characterized as a natural duty." *State v. Williams*, 4 Wn. App. 908, 912, 484 P.2d 1167 (1971). "In Washington, the existence of the duty is commonly assumed." *Williams*, 4 Wn. App. at 912. "[T]he violation of the parental duty to furnish medical care to a minor dependent child, . . . is a sufficient basis" for criminal liability, so long as the other elements of the crime are satisfied. *Williams*, 4 Wn. App. at 915.

> If one in the exercise of ordinary caution fails to recognize that [her] child's symptoms require medical attention, it cannot be said that the failure to obtain such medical attention is a breach of the duty owed. . . . "[T]he standard is at what time would an ordinarily prudent person, solicitous for the welfare of [her] child and anxious to promote its recovery, deem it necessary to call in the services of a physician."

*Williams*, 4 Wn. App. at 916-17 (quoting *People v. Pierson*, 176 N.Y. 201, 68 N.E. 243, 244 (1903)).

McMillen relies on *Colyer* and *Commonwealth v. Pugh*, 462 Mass. 482, 969 N.E.2d 672 (2012), to argue that it would be unconstitutional to hold her criminally liable for her failure to seek medical assistance for her baby because the right to privacy allows her to refuse medical treatment. Pugh was convicted of involuntary manslaughter for the unintentional death of her viable fetus in the midst of unassisted childbirth. *Pugh*, 969 N.E.2d at 676. In *Pugh*, the State failed to prove the baby was born alive or that medical assistance would have saved the baby's life; therefore, it held insufficient evidence existed to prove proximate cause. *Pugh*, 969 N.E.2d at 676-77. However, McMillen's reliance on *Pugh* is misplaced because of significant factual distinctions. Most importantly, the trial court found that McMillen's baby was born alive and sufficient evidence supports that finding.

Here, McMillen's right to privacy was not violated. McMillen gave birth to a live baby. McMillen had a duty to exercise ordinary caution to provide the baby with the necessities of life. *Williams*, 4 Wn. App. at 916-17. This case was not about McMillen refusing medical care for herself or about her right to privacy of her own body. This case was about abandoning her baby who was born alive. She abandoned her live baby which led to the baby's death. Finding her guilty did not violate McMillen's right to privacy.

B.     EQUAL PROTECTION

McMillen argues that being held criminally liable for her failure to call for medical assistance for the baby after an unexpected home delivery is a violation of her right to equal protection. We disagree.[8]

Under the Washington and federal constitutions, persons similarly situated with respect to the legitimate purposes of the law are guaranteed equal treatment. U.S. CONST. amend. 14; WASH. CONST. art. I, § 12; *State v. Manussier*, 129 Wn.2d 652, 672, 921 P.2d 473 (1996), *cert. denied*, 520 U.S. 1201, 117 S. Ct. 1563, 137 L. Ed. 2d 709 (1997). "Equal protection is denied if a valid law is administered in a way that unjustly discriminates between similarly situated persons. Before [we] will scrutinize an equal protection claim, the defendant must establish that he is situated similarly to others in a class." *Harris v. Charles*, 151 Wn. App. 929, 936, 214 P.3d 962 (2009) (citation omitted).

Equal protection challenges are analyzed under one of three standards of review: strict scrutiny, intermediate scrutiny, or rational basis. *Manussier*, 129 Wn.2d at 672-73. McMillen did not specify the level of scrutiny to apply in her case. She seemingly alleges that her personal right

---

[8] We note that the trial court did not find McMillen guilty for failing to call for medical assistance. It found her found guilty for abandoning her live baby which caused the baby's death.

to privacy has been violated because she did not seek out medical assistance for her baby. Therefore, we review McMillen's challenge under the strict scrutiny standard. *Washington v. Glucksberg*, 521 U.S. 702, 719-20, 117 S. Ct. 2258, 138 L. Ed. 2d 772 (1997) (acknowledging the right to refuse medical treatment as a fundamental right, citing *Cruzan v. Director, Mo. Dept. of Health*, 497 U.S. 261, 278-79, 110 S. Ct. 2841, 111 L. Ed. 2d 224 (1990)).

In addition, McMillen does not specify what groups she alleges are not receiving equal treatment. She seems to claim that the comparison groups are pregnant women giving birth at home without assistance and pregnant women giving birth with assistance in a hospital. Under the strict scrutiny standard, the State's purpose must be compelling and the law must be necessary to accomplish that purpose. *State v. Ward*, 123 Wn.2d 488, 516, 869 P.2d 1062 (1994). McMillen does not tell us what the State's potential purpose is or why it is not compelling or necessary in accomplishing the purpose. She does not adequately argue this issue for our review because we "do not consider conclusory arguments unsupported by authority." *State v. Mason*, 170 Wn. App. 375, 384, 285 P.3d 154 (2012); RAP 10.3(a)(6), 16.10(d).

McMillen seems to assert that the refusal to seek medical treatment at her home-birth is the equivalent of asserting her personal right to refuse medical treatment. However, she fails to explain how her abandonment of a live baby equates to an assertion of her right to refuse medical treatment. The State has compelling purpose to protect its citizens and ensure that citizens incapable of seeking medical treatment on their own receive treatment. The Supreme Court made clear that there is a difference between a competent person refusing medical treatment, and someone making that decision for a dependent person. *Cruzan*, 497 U.S. at 287 n.12. Washington holds parents criminally liable for not giving their children necessary medical assistance. *Williams*, 4 Wn. App. at 915. The trial court found that McMillen gave birth to a live baby, and

25

therefore, she had a duty to seek medical treatment for that baby. The choice for medical treatment was not about her own treatment, it was for her dependent baby. Regardless of whether women give birth at home or in a hospital, a baby born alive must be given necessary medical assistance. Therefore, we conclude that McMillen's conviction does not violate her right to equal protection.

IV.     INEFFECTIVE ASSISTANCE OF COUNSEL

McMillen argues she received ineffective assistance of counsel because her counsel failed to investigate her mental state. We disagree and conclude that McMillen did not receive ineffective assistance of counsel.

A.      STANDARD OF REVIEW

The same standard of review for ineffective assistance of counsel applies here as in McMillen's direct appeal. A petitioner "need not 'satisfy a heightened prejudice requirement under actual and substantial prejudice that exceeds the showing of prejudice necessary to successfully establish the *Strickland* prejudice prong' when the PRP is based on ineffective assistance of counsel." *Monschke*, 160 Wn. App. at 490-91 (quoting *In re Pers. Restraint of Crace*, 157 Wn. App. 81, 112-14, 236 P.3d 914 (2010)).

B.      MCMILLEN DID NOT RECEIVE INEFFECTIVE ASSISTANCE OF COUNSEL

McMillen argues that a diminished capacity defense should have been investigated. To support her argument, McMillen included a letter from Duenhoelter, a retired OB/GYN, to her trial attorney. Duenhoelter recommended that an evaluation by a forensic psychiatrist or psychologist could be helpful, but he never stated anything about McMillen's condition that would prove diminished capacity.

To prove a mental condition or disorder, a defendant generally must offer expert testimony to show the required nexus between the disorder and the alleged inability to form the requisite specific intent. *State v. Stumpf*, 64 Wn. App. 522, 526-27, 827 P.2d 294 (1992). "The expert's testimony must be based upon an extensive foundation and provide an explanation of how the mental disorder caused the inability to form the specific intent." *State v. Eakins*, 127 Wn.2d 490, 506, 902 P.2d 1236 (1995).

The Duenhoelter letter does not demonstrate that a diminished capacity defense would have succeeded or that McMillen's counsel could have found an expert to testify as such. McMillen fails to present any other evidence of her counsel's failure to investigate this issue or how a diminished capacity defense would have been in accordance with her defense that the baby was not born alive.

Additionally, McMillen fails to meet her burden of establishing the absence of any conceivable legitimate trial tactic explaining counsel's performance. Again, McMillen's defense theory was that the baby was not born alive. Her expert's testimony revolved around the difficulty in conclusively determining whether or not the baby was born alive and later died. Had McMillen's counsel presented evidence of a diminished capacity defense, it could have undermined the theory that the baby was not born alive, or that McMillen believed the baby was stillborn. *See In re Pers. Restraint of Woods*, 154 Wn.2d 400, 421, 114 P.3d 607 (2005).

For these reasons we conclude that McMillen failed to provide any persuasive evidence that she received ineffective assistance of counsel.

We affirm the conviction and deny the petition.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Melnick, J.

We concur:

_____
Lee, P.J.

_____
Sutton, J.